Ryan McFarland, ISB 7347
Brent Bastian, ISB 8071
Scentsy, Inc.
*rmcfarland@scentsy.com*
*bbastian@scentsy.com*
2701 E. Pine Ave.
Meridian, ID 83642
Telephone:  208.286.3979
Fax:  208.895.1270

### IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| SCENTSY, INC., an Idaho corporation, | ) | |
| | ) | |
| *Plaintiff,* | ) | Case No. _____ |
| | ) | |
| | ) | |
| | ) | |
| vs. | ) | **COMPLAINT** |
| | ) | |
| | ) | |
| BLUE CROSS OF IDAHO HEALTH | ) | |
| SERVICE, INC., an Idaho corporation, | ) | |
| | ) | |
| *Defendant.* | ) | |
| _____ | ) | |

**NOW COMES** Plaintiff Scentsy, Inc., and files this Complaint and complains of and about the unlawful actions of Blue Cross of Idaho Health Service, Inc.

### I. PARTIES

1.      Plaintiff Scentsy, Inc. ("Scentsy") is an Idaho corporation.  Its primary place of business is located in Meridian, Idaho, at 2701 E. Pine Ave., Meridian, Idaho 83642.

2.      As described more fully below, Scentsy is the sponsor and a fiduciary of a self-insured and self-funded health care benefit plan called the Scentsy, Inc. Group Health Plan (the "Plan") organized and existing pursuant to 29 U.S.C. § 1002(1).  Scentsy brings this suit for itself and on the Plan's behalf.

3.    Defendant Blue Cross of Idaho Health Service, Inc. ("Blue Cross") is an Idaho corporation.  Its principal place of business and main office is 3000 E. Pine Ave., Meridian, Idaho 83642.

## II. JURISDICTION AND VENUE

4.    This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1331 because the claims arise under the laws of the United States.  Specifically, Scentsy brings this action to enforce its rights, and the Plan's rights, under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.* ("ERISA"), and as allowed by 29 U.S.C. § 1132.

5.    This Court has supplemental jurisdiction over all other claims pursuant to 28 U.S.C. § 1367.

6.    Venue in this district is appropriate.  Both parties' headquarters are located in this district and both parties do substantial business in this district.  Many of the operative facts related to this action took place in this district.  In fact, as described more fully below, the parties specifically agreed to both the jurisdiction and venue of this Court in the contracts made the subject of this dispute.

## III. FACTS

### A.  Introduction

7.    This case concerns Blue Cross's failure to live up to its contractual and fiduciary obligations to timely pay claims.  It agreed to serve both as the administrator of Scentsy's health Plan and as its excess-loss insurer.  Unfortunately, Blue Cross abused both roles:  it needlessly delayed the administration of a set of high-dollar claims and then attempted to use its own delay to avoid payment as Scentsy's insurer.  When Scentsy complained, Blue Cross doubled down, arguing *first* that its contract had deadlines which simply do not exist, and *second* that its delays

could be explained by the size or location of the claims, somehow ignoring that it had paid a nearly identical set of claims for the previous month in a small fraction of the time.

### B. The Contracts

8.       Scentsy is a fragrance company based in Ada County.  It has around 1,500 employees across the world, the majority of which work from Scentsy's offices in Meridian, Idaho.

9.       As part of providing health insurance to qualifying employees and their families (hereinafter "Participants"), Scentsy decided to develop a healthcare plan.  Like most self-funded employers, Scentsy lacked the knowledge or expertise to develop or administer a plan itself, so it turned to Blue Cross, a health insurance company who represented itself as having skill in this area.  Blue Cross essentially drafted the Plan, and Scentsy adopted it.

10.      Blue Cross and Scentsy also agreed to two sets of contracts relevant here.  *First*, Scentsy and Blue Cross entered into a series of administrative services agreements or "ASAs." The gist of those contracts was that in exchange for remuneration Blue Cross would manage Participant benefit claims on Scentsy's behalf.

11.      *Second*, Scentsy and Blue Cross entered into a series of "Excess Loss Contracts." A true and correct copy of the 2021-2022 Excess Loss Contract is attached hereto as Exhibit 1. Generally, excess-loss contracts can be thought of as catastrophic insurance policies, only becoming active when a truly serious and expensive illness or injury occurs.  In this case, the Excess Loss Contract left Scentsy to cover most Participant healthcare claims, but once a Participant incurred $200,000 or more of expenses, Blue Cross would step in to cover the costs. *See* Exhibit 1 at 2 and at its Appendix A.  The Excess Loss Contract relevant here was effective from May 1, 2021, to April 30, 2022.

12.      Blue Cross provided the form for all ASAs and Excess Loss Contracts.  These were its contracts, modified slightly for Scentsy.

COMPLAINT - 3

13.     In practice, the arrangement between the parties pursuant to these two sets of contracts was as follows:

- A claim would originate when a Participant received covered services, *i.e.*, medical care; then

- The provider, such as a doctor or clinic, would bill Blue Cross; then

- Blue Cross would review the bill, make decisions as to coverage, and make adjustments, applying its own internal policies and procedures, as well as the contracted rate it had negotiated with these providers; and then

- Blue Cross would directly debit the Plan's account to pay the claim unless the amount at issue met the $200,000 threshold outlined in the Excess Loss Contract, in which case Blue Cross would pay the claim(s) as Scentsy's insurer (less the first $200,000).

14.     Under previous excess-loss contracts, the processing times for some claims had the potential to be very important.  For example, in years past the parties had agreed that the excess-loss coverage would only be provided if the services were rendered, billed, and paid within a fixed (not rolling) 15-month period.  In such a case, the onus would be on Blue Cross to be very efficient, because as administrator of the Plan it was in complete control of the timing of payment, and that timing would ultimately determine whether Scentsy or Blue Cross was on the hook for larger bills.  Put another way, if Blue Cross wanted to nefariously avoid payment for a high-dollar claim as an *insurer*, all it would have to do would be to unnecessarily delay payment of a bill for a few months as an *administrator*.  And in such a case, Scentsy would be entirely at Blue Cross's mercy:  even if it wanted to hurry Blue Cross along, Scentsy would have no way of knowing that services had been provided to a Participant or that a bill had been generated until after Blue Cross had already processed it and debited the Plan account.

15.     It is for this reason, among others, that the parties originally agreed in the 2019-2020 ASA that Blue Cross would "adopt reasonable policies, procedures, [and] rules" to "orderly and efficient[ly] administ[er]" the Plan—or at the very least that Blue Cross would not

adopt policies which would result in a *dis*orderly and *in*efficient administration of the Plan. *See* Exhibit 2, which is a true and correct copy of the 2019-2020 ASA, at 3, § II(C).

16.     But in the 2021-2022 Excess Loss Contract, this potential conflict of interest was not as much an issue.  In that agreement, unlike in years before, the parties did not agree to the fixed 15-month period for claims.   Rather, they did the opposite.    As it related to a Participant whose medical claims exceeded $200,000, Blue Cross was to "indemnify" Scentsy for those costs, conditioned only on those claims being "incurred during the Contract Period, and…paid either during the then Contract Period or *during the months immediately following that Contract Period*."   *See* Exhibit 1 at 2 ("Specific Loss Coverage") (emphasis added). In other words, while some other provisions in this and other contracts limited the relevant timeframe to the plan year plus three months, in the provision here the coverage extended to just "*months* immediately following" that plan year.   *Compare id.* at Article II(A) *with* Article III(A) (emphasis added).

### C. Blue Cross Quietly Amends the ASA to Provide Superficial Arguments Against It Being a Fiduciary, But Changes Nothing Substantively About Its Administration

17.     In February of 2020, a federal court in North Carolina issued a decision entitled *Technibilt Grp. Ins. Plan v. Blue Cross & Blue Shield of N. Carolina*, 438 F. Supp. 3d 599 (W.D.N.C. 2020).  This decision is extraordinarily germane here.  The facts of the *Technibilt* case are strikingly similar to those described below, including that the plaintiff, Technibilt, and North Carolina's Blue Cross had an administrative services agreement which, just like the 2019-2020 ASA, allowed for North Carolina's Blue Cross to "apply its standard practices, policies and procedures" in its administration of Technibilt's employee plan.  *See* 438 F.Supp. 3d at 606 n.3; *compare* Exhibit 2 at 3, § II(C).  Importantly, the *Technibilt* court found that the

existence and exercise of this language, among other things, made the North Carolina Blue Cross a plan fiduciary under ERISA. *See* 438 F.Supp. 3d at 606 n.3.[1]

18.    Just a few months after the *Technibilt* decision was entered, Blue Cross sought to enter into a new ASA with Scentsy which, among other things, removed the 2019-2020 ASA's explicit right for Blue Cross to apply its own "policies, procedures, rules and interpretations of this Agreement and the Plan."  Its approach was surreptitious; it did not tell Scentsy that it wanted to make this change in an attempt to avoid the ERISA ramifications of the *Technibilt* decision.  But the timing and its targeting of almost identical language in the ASA leave little doubt that this was its goal.  A true and correct copy of the 2020-2021 ASA is attached hereto as Exhibit 3.[2]

19.    Notably, however, Blue Cross's superficial change to the ASA changed nothing about its actual administration.  As described more fully below, Blue Cross continued to use all of its own policies and procedures to process claims, just as it had before, and refused to alter them even when it knew its policies would do significant harm to Scentsy.  In sum, the elimination of previous "policies and procedures" clause was self-interested window dressing, nothing more.

20.    But even as it removed this provision, Blue Cross also added a new set of terms in the 2020-2021 ASA which explicitly made clear that it was to continue to act as a Plan fiduciary.  Specifically, it agreed in that document to "[a]ct as an ERISA Claim Fiduciary…in adjudicating initial claims and reviewing denied claims for benefits under the Plan…."  *See* Exhibit 3 at 4,

---

[1] The Court followed this decision, made on a motion to dismiss, with an even more emphatic holding on summary judgment. *See Technibilt Grp. Ins. Plan v. Blue Cross & Blue Shield of N. Carolina*, 2021 WL 1147168, *2 (W.D.N.C. 2021).

[2] Blue Cross had Scentsy execute this ASA in August of 2020, and then again in December of 2020.  The terms of these two ASAs have no differences Scentsy can perceive, at least in their bodies (their appendices may contain some).  It is the December 2020 ASA which is attached as Exhibit 3.  Furthermore, in this and the other attached ASAs, Scentsy has removed the "Benefit Summary" made as their respective Appendix Bs.  As discussed below, the terms of those Appendixes take up 235+ additional pages.  Scentsy is happy to provide the Court with a copies but did not want this current pleading to become unwieldy.

§ II(B)(4). This was consistent with Blue Cross's duties under that ASA, since it exercised essentially unilateral discretion over the administration of the Plan.

21.    Of note, when Blue Cross sought to amend the 2020-2021 ASA in the middle of 2021, it replaced §§ II(B)(1)-(3) with slightly new language, but left the previous § II(B)(4) intact. *See* Exhibit 4, which is a true and correct copy of the 2021 Amendment to Administrative Services Agreement, at 1-2, § 3(C). And again, just as with the "policies and procedures" change in 2020, these alterations to § II(B) in 2021 changed nothing about Blue Cross's actual administration of the Plan—its superficial contractual changes had no effect on how it processed and paid Plan claims, internally or externally.

### D. *Blue Cross Inexplicably Delays Its Administration of a Large-Dollar Set of Claims*

22.    In or around February of 2022, one of the Participants in Scentsy's Plan became seriously ill (the "Patient"[3]). The Patient was admitted to a hospital in California where the Patient ultimately incurred millions of dollars' worth of medical bills. The Patient's first set of claims for that hospital stay worked precisely how Scentsy would have hoped: medical services were rendered between February 20, 2022 and March 21, 2022; relevant bills were submitted to Blue Cross; and because the bills were well in excess of $200,000, Blue Cross paid them pursuant to the Excess Loss Contract on May 30, 2022. Thus, from the last date of provider services to Blue Cross's payment was about 70 days.

23.    Oddly, Blue Cross treated the Patient's next set of bills much differently for reasons Blue Cross has never adequately explained to Scentsy. For the services rendered in the following thirty days - between March 22, 2022 and April 20, 2022—Blue Cross took just under *six months* from the last date of services to process payment (in October of 2022). That is, as compared to the February-March bills, which took just 70 days to process, the March-April payment somehow took about *170* days, or two-and-a-half times as long. And based on its own

---

[3] In the interests of confidentiality, Scentsy is choosing to disclose as little as possible about the identity of the Patient in this Complaint. Blue Cross is well aware of the Patient's identity and medical background.

dilatory handling of this claim, Blue Cross also conveniently decided that it was not liable for reimbursing Scentsy for these claims because they now fell outside of a fixed 15-month window.

24.    But Blue Cross's refusal to indemnify Scentsy for the Patient's March-April bills is problematic on multiple fronts.  First and again, the "Specific Excess Loss" provision which Blue Cross drafted has no fixed 15-month window, even if Blue Cross erroneously believes it does.  Instead, that contract only requires that the claim be incurred, submitted, and paid in the "months immediately following" the plan year.  *See* Exhibit 1 at 2.  Not "*three*" months, just "months."  *Id.*  Plainly, October of 2022 is a month immediately following the plan year at issue.

25.    Second, even if the contract read as Blue Cross wished it did, Blue Cross has no legitimate explanation for its lengthy delay in processing the second set of claims.  It should first be noted that the bills for the second set of claims were incurred under nearly identical circumstances to those of the first.  Specifically, they were: (i) for the same Patient; (ii) receiving the same services; (iii) for the same illness(es); (iv) at the same hospital and clinics; (v) in the same general timeframe; (vi) for roughly the same amount of time (30 days); and (vii) at very similar dollar amounts.  As to the latter, the dollar amount paid for the February-March bill was around $987,000, while the March-April bill was around $922,000, a difference of only 6.6%.[4]

26.    So what explains the nearly three-and-a-half extra months of processing time for the March-April bills versus the February-March bills?  Scentsy has asked Blue Cross that exact question several times over the last year and still is not sure Blue Cross itself knows what its answer is.  Blue Cross has oscillated between providing no information at all for months and then offering multiple conflicting responses.  Indeed, Scentsy is concerned that once this litigation begins in earnest, Blue Cross's explanation will change again, just as it has every time Scentsy has pushed back.

---

[4] The March-April set of bills eventually went up by an additional $490,000 or so, but the February-March bills did nearly the same thing and were paid.  As Blue Cross has informed Scentsy, if the initial determination was to allow payment, any additional amounts added after any putative deadlines are allowable as well.

27.    That said, four relevant Blue Cross admissions have emerged out of its many otherwise contradictory excuses:

   a.  that Blue Cross made the unilateral decision to have this second set of bills "priced" by its affiliate, Blue Shield of California (hereinafter "Cal Shield")— which is apparently Blue Cross code for "processed";

   b.  that Blue Cross knew at the time that the Patient was incurring significant bills and that Cal Shield was taking an abnormally long amount of time to process them; but

   c.  that Blue Cross apparently had an undisclosed internal policy that it would never even contact an affiliate like Cal Shield to talk about claims, much less attempt to hurry its processing along or inform it of impending deadlines; and

   d.  that even under the most forgiving readings of the timelines provided, there are several weeks of unaccounted-for time during the processing where it appears almost nothing was done by either Blue Cross or Cal Shield.

28.    Even a small amount of diligence by Blue Cross or its delegate Cal Shield would have easily brought the second set of claims in under the nonexistent deadline Blue Shield alleges to be in the Excess Loss Contract.

29.    Not only did Scentsy not know that Blue Cross had delegated its processing duties to Cal Shield until months later, but Blue Cross was adamant that Scentsy was to have no relationship with Cal Shield or any other of its similar "Blue Host" affiliates anyway.  Blue Cross insisted in the ASA that it *might* choose to use a Blue Host like Cal Shield to process out-of-state claims, but when it did, "BCI remain[ed] responsible for fulfilling its contractual obligations [to process claims] to you," and that no "organization other than BCI shall be held accountable" to Scentsy for misprocessing Claims.  *See* Exhibit 3 at 12, § VII(E) and 16-17, § VII(I).

30.    In sum, even if Blue Cross's phantom 15-month deadline applied, the problem was never that Blue Cross did not have the ability to process the claims prior to the deadline, but instead that it did essentially nothing to get them processed in a timely fashion.  And at the risk of repetition, this delay was on a set of bills that by all appearances was functionally identical to ones Blue Cross had somehow been able process *14 weeks quicker* for the previous month.  Blue Cross's secretive internal policies of inaction led directly to this entirely unnecessary delay - a delay which Blue Cross believed would inure to its own pecuniary benefit.

31.    The length of Blue Cross's processing is not just facially outrageous, it is contrary to the law.  ERISA's Section 503 requires decisions to be made as to all claims such as these "within a reasonable time, but not later than 30 days after receipt of the claim."  *See* 29 C.F.R. § 2560.503-1(f)(2)(iii)(B).

32.    Given Blue Cross's lack of transparency and the self-serving nature of the delay, the only conceivable explanation here is that Blue Cross has breached its fiduciary duties and has been either grossly negligent as an administrator or has not acted in good faith as an insurer. At the very least, Blue Cross failed to "[p]rocess and pay" the "Benefit Claims" in question in any meaningful way.  *See* Exhibit 4 at 1-2.  Rather, it utilized undisclosed and unreasonable internal policies which predictably resulted in a disorderly and inefficient administration of the Plan - including but not limited to its policy of never even communicating with the "Blue Host" whom it asks to process claims on its behalf.

33.    These secret internal policies explicitly violate the ASA because, among other things, Blue Cross was required to administer the Plan solely according to "Plan Documents and/or Summary of Health Care Benefits" and nowhere in any such document is there any mention of Blue Cross's policy of never communicating with Blue Host partners about time-sensitive pending claims.  *Id.; see also* Exhibit 3 at 10, § VII(A) ("BCI is empowered to act…in connection with the Plan(s) only as expressly stated in this Agreement….").  Blue Cross

followed its own undisclosed defective policies for its own benefit, not the Plan's.  And with its ill-advised elimination of former § II(C)'s "policies and procedures" language in the 2019-2020 ASA, it no longer even had an arguable contractual right to do so.  *See* Exhibit 2 at 3, § II(C).

34.    Scentsy, through the Plan, has been forced to pay the claims described above and other similar bills Blue Cross should have paid under the 2021-2022 Excess Loss Contract. Scentsy currently believes the Plan has been deprived of at least $1.6MM as a result, but given that Blue Cross is in control of much of the relevant documentation, the actual amount may be significantly more.

35.    In that regard, Scentsy has requested more fulsome records from Blue Cross so as to determine whether Blue Cross has engaged in similar behavior, including documents related to the Patient.  To date, Blue Cross has largely denied Scentsy's request, offering instead to provide a "sample" of data—a "sample" chosen unilaterally by Blue Cross.  Once Scentsy obtains a full set of documents in discovery, it will move to amend to add further claims as appropriate.

## IV.    EXHAUSTION OF REMEDIES; ARBITRATION

36.    Scentsy has no legal obligation under ERISA or otherwise to exhaust administrative remedies for the claims raised in this Complaint under existing applicable law.  Its claims are therefore ripe for review.

37.    To the extent Scentsy has such an obligation, it has fully exhausted its remedies. As per the ASA, the parties mediated this matter, but without success.  *See* Exhibit 3 at 9, § VI(B).

38.    Prior to this filing there were frequent discussions between the parties as to whether, in the event of a lawsuit, the parties were required to arbitrate.  In what has become emblematic of Blue Cross's lack of good faith in this action, Blue Cross was adamant throughout those discussions that if any action was to be filed, it *must* be an arbitration action.  Scentsy did so, at Blue Cross's insistence.  Bizarrely, however, once Scentsy filed arbitration and paid a

sizeable fee, Blue Cross immediately moved to dismiss the matter for lack of an arbitration clause. When Scentsy pushed back—showing the Arbitrator how many times Blue Cross had insisted in writing on arbitration—Blue Cross tried to about-face its about-face, now arguing that there actually was an applicable arbitration clause, except in a different agreement than Scentsy had quoted, which it tried to play as the real reason it had moved to dismiss the matter in its entirety.

39.     For its part, Scentsy never wanted to arbitrate in the first place and was tired of waiting for Blue Cross to make up its mind, so it withdrew its arbitration demand and filed this action. More to the point, there is no applicable arbitration clause. In fact, the opposite is true. In both the 2020-2021 ASA and in the 2021-2022 Excess Loss Agreement, which are the relevant agreements here, the parties specifically agreed that "[a]ny claim or lawsuit arising from or relating to this Agreement shall be filed and maintained in a court of competent jurisdiction in Ada County, Idaho." *See* Exhibit 1 at 6, § IX(A); *see* Exhibit 3 at 9, § VI(A). The agreement Blue Cross believes should control, the 2022 ASA, does not control the claims at issue.

## V.    CAUSES OF ACTION

40.     The following causes of action, allegations, and damages are pleaded in the alternative but may be applied cumulatively where the law allows.

### First Cause of Action:
### Breach of Fiduciary Duty Under 29 U.S.C. § 1132(a)(2), ERISA 502(a)(2)

41.     The preceding paragraphs are incorporated herein as if fully set forth.

42.     Blue Cross has fiduciary, contractual, and statutory duties to Scentsy to discharge its expressly delegated fiduciary duties in accordance with ERISA, its promulgating regulations, and the documents and instruments governing the Plan, including but not limited to the Plan itself, the ASA, and the Excess Loss Contract.

43.     At all relevant times alleged herein, Blue Cross was both a named and functional fiduciary of the Plan and was acting in its fiduciary capacity with respect to the specific issues alleged herein, including all conduct, actions, and inaction alleged herein.

44.     As to being a *named* fiduciary, Blue Cross specifically called itself "an ERISA Claim Fiduciary" for "adjudicating initial claims and reviewing denied claims for benefits under the Plan…." *See* Exhibit 3 at 4, § II(B)(4).

45.     As to being a *functional* fiduciary, Blue Cross took on the responsibility of administering and servicing the Plan in the ASA, including but not limited to performing all third-party administrative services, including all claim processing, claim investigations, benefit determinations, payment of claims, recordkeeping, benefit determination notifications, and the general management, control, and disposal of Plan assets. *See, e.g.,* Exhibit 3 at 3-6, § II and Exhibit 4 at 1-2, §§ 3(B)-(E).

46.     In all such actions, Blue Cross exercised significant control and discretion over claims, Participants, and Plan assets. Indeed, it processed and paid claims to Plan Participants entirely on its own with no input from Scentsy. Due to the Plan's complexity—a Plan which Blue Cross itself essentially drafted—Blue Cross was required to routinely interpret and apply its provisions. *Id.* Blue Cross was not proceeding according to some formulaic paint-by-the-numbers routine dictated solely by easy-to-follow Plan terms. Rather, the Benefit Summaries alone, which make up the excised Appendix Bs to Exhibits 3 and 4, are 235+ pages of detailed instructions and procedures in single-spaced 10-point font. The framework Blue Cross set up is strikingly elaborate for its application to be purely ministerial.

47.     In recognition of this complexity, Blue Cross originally bargained to be allowed to apply its own internal "policies, procedures, rules, and interpretations…of the Plan" in order to administer it. See Exhibit 2 at 3, § 2(C). And while it eliminated that provision in its subsequent ASA (*see* Exhibit 3), the deletion made no change to its actual administration.

COMPLAINT - 13

Blue Cross continued using all the same policies and procedures it had employed previously, it just did so without a specific contractual grant of authority to do so.

48.     In fact, Blue Cross was implementing its own internal policies and procedures with respect to the claims at issue in this matter when it made choices regarding the delegation and handling of claims and the timing of related payments, all of which significantly and negatively impacted the Plan.

49.     Blue Cross further exercised substantial control over the Plan when it reserved the right to hire third parties without Scentsy's preapproval to help it comply with its elaborate obligations under the Plan.  *See* Exhibit 3 at 12, § VII(E).  Blue Cross alleges it did so under the facts at hand, and the inaction by the third party which Blue Cross retained, coupled with Blue Cross's self-interested failure of supervision, caused the delays described above.

50.     In addition, Blue Cross made essentially all benefit determinations entirely on its own.  *See* Exhibit 3 at 4, § II(B) and Exhibit 4 at 1-2, § 3(A)-(E).  It made all initial determinations, and handled pre-service appeals, urgent appeals, and post-service appeals.  *Id.* Indeed, Scentsy has no recollection of Blue Cross ever even having asked Scentsy to meaningfully participate in any determination or appeal.  And Blue Cross's plenary administration of the Plan inherently required that it interpret the Plan to determine whether to pay claims and or uphold benefit denials.  In short, Blue Cross had the authority to unilaterally grant, deny, and review *every* claim, including the claims at issue here.

51.     Blue Cross also exercised actual control over plan assets, including the assets used to pay the claims in dispute in this matter.  Specifically, Blue Cross had direct and unfettered access to Plan funds and used them as it saw fit.  Blue Cross purposefully carved out an automatic debit provision in the ASA with which it was able to pay claims.  *See* Exhibit 3 at 7, § III(I).  This essentially made Blue Cross a signer on the Plan account with the ability to take money from it at will.  Blue Cross did not need Scentsy's permission to reimburse itself after

making its unilateral decision to pay a claim; Scentsy was never asked to approve or disapprove transactions prior to withdrawal.  *Id.*  Instead, Scentsy's only responsibility under that provision was to make sure that the funds were there for Blue Cross to automatically debit once Blue Cross decided it wanted money.  *Id.*  Put simply, Blue Cross was able to use Plan funds at any time and for any purpose it chose, and did so repeatedly, including in this case.

52.    Scentsy is also a fiduciary with standing to assert ERISA causes of action on its own and on behalf of the Plan.

53.    29 U.S.C. § 1109(a), ERISA 409(a), provides that:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

54.    29 U.S.C. § 1104(a)(1)(A), ERISA 404(a)(1)(A), obligates a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan."

55.    29 U.S.C. § 1104(a)(1)(B), ERISA 404(a)(1)(B), obligates a fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

56.    29 U.S.C. § 1104(a)(1)(D), ERISA 404(a)(1)(D), obligates a fiduciary to act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III."

57.    These ERISA fiduciary duties have been described by many courts as "the highest known to the law."  *See, e.g., Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016).

58.     Scentsy and/or the Plan relied on Blue Cross to adhere to its fiduciary duties.  As explained above, as both the administrator and the insurer in this scenario, Scentsy was especially vulnerable to Blue Cross—Blue Cross knew it was in a special position to profit from its own inaction.  Blue Cross also knew that Scentsy was depending on its integrity and fidelity to avoid making a decision beneficial to Blue Cross but detrimental to Scentsy and/or the Plan.

59.     Nonetheless, Blue Cross violated its fiduciary duty in several ways, including the following (pled in the alternative):

    a.  By failing to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

    b.  By failing to act solely in the interest of and for the exclusive purpose of providing benefits to Participants and their beneficiaries and defraying reasonable expenses of administering the Plan;

    c.  By failing to process the claims consistent with the deadlines set forth in ERISA's regulations, as described above;

    d.  By failing to discharge its duties or otherwise act in accordance with the documents and instruments governing the Plan, as described above;

    e.  By not paying claims in accordance with the agreement(s) between the parties, while knowing the detrimental effect that these delays and contractual breach(es) would have on Scentsy and the Plan;

    f.  By failing to comply with the agreements between the parties even after being alerted to Blue Cross's obviously erroneous interpretation of same;

    g.  By failing to adequately or timely process benefit claims and by needlessly delaying payment of same;

COMPLAINT - 16

h. By implementing policies, procedures, and rules not found in Plan documents;

i. To the extent that it was allowed under Plan documents to implement its own policies, procedures, and rules, by failing to institute reasonable policies, procedures, and rules in order to provide an orderly and efficient administration of Scentsy's Plan;

j. To the extent that it was allowed under Plan documents to implement its own policies, procedures, and rules, by instituting unreasonable policies, procedures, and rules which led to a disorderly and inefficient administration of Scentsy's Plan;

k. To the extent it delegated its responsibilities to a third party or affiliate, by failing to take any action to alert that third party or affiliate of relevant deadlines;

l. To the extent it delegated its responsibilities to a third party or affiliate, by failing to take any action to attempt to expedite that party's review;

m. By mishandling essential Plan functions expressly delegated to it;

n. By failing to exercise appropriate authority or control over Plan assets;

o. By mismanaging and/or maladministering Plan assets; and

p. By causing the unnecessary depletion, impairment, and/or disposal of Plan assets.

60. As a proximate result of these breaches, among others, Scentsy and/or the Plan suffered the harm and damages described above, currently believed to be in excess of $1.6MM. Blue Cross should be compelled to either pay damages or hold the funds it took in violation of its fiduciary duty in constructive trust for Scentsy and/or the Plan.

61. Pursuant to 29 U.S.C. § 1109, ERISA 409, Blue Cross is personally liable to make good to Scentsy and/or the Plan any losses resulting from its breach of fiduciary duty. Blue Cross is also subject to such other equitable or remedial relief as may be appropriate.

*Second Cause of Action:*
*Breach of Fiduciary Duty Under 29 U.S.C. § 1132(a)(3), ERISA 502(a)(3)*

COMPLAINT - 17

62.     The preceding paragraphs are incorporated herein as if fully set forth.

63.     Alternatively, as described more fully above, at all relevant times alleged herein, Blue Cross was both a named and functional fiduciary of the Plan and was acting in its fiduciary capacity with respect to the specific issues alleged herein, including all conduct, actions, and inaction alleged herein.

64.     29 U.S.C. § 1132(a)(3), ERISA 502(a)(3), provides that:

> A civil action may be brought by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

65.     29 U.S.C. § 1109(a), ERISA 409(a), provides that:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

66.     29 U.S.C. § 1104(a)(1)(A), ERISA 404(a)(1)(A), obligates a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan."

67.     29 U.S.C. § 1104(a)(1)(B), ERISA 404(a)(1)(B), obligates a fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

68.     29 U.S.C. § 1104(a)(1)(D), ERISA 404(a)(1)(D), obligates a fiduciary to act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III."

69.     These ERISA fiduciary duties have been described by many courts as "the highest known to the law."  *See, e.g., Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016).

70.     Scentsy and/or the Plan relied on Blue Cross to adhere to its fiduciary duties. As explained above, as both the administrator and the insurer in this scenario, Scentsy was especially vulnerable to Blue Cross—Blue Cross knew it was in a special position to profit from its own inaction.  Blue Cross also knew that Scentsy was depending on its integrity and fidelity to avoid making a decision beneficial to Blue Cross but detrimental to Scentsy and/or the Plan.

71.     Nonetheless, Blue Cross violated its fiduciary duty in several ways, including the following (pled in the alternative):

a.  By failing to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

b.  By failing to act solely in the interest of and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan;

c.  By failing to process the claims consistent with the deadlines set forth in ERISA's regulations, as described above;

d.  By failing to discharge its duties or otherwise act in accordance with documents and instruments governing the Plan, as described above;

e.  By not paying claims in accordance with the agreement(s) between the parties, while knowing the detrimental effect that these delays and contractual breach(es) would have on Scentsy and the Plan;

f.  By failing to comply with the agreements between the parties even after being alerted to Blue Cross's obviously erroneous interpretation of same;

g.  By failing to adequately or timely process and pay benefit claims and by needlessly delaying payment of same;

h.  By implementing policies, procedures, and rules not found in Plan documents;

i.  To the extent that it was allowed under Plan documents to implement its own policies, procedures, and rules, by failing to institute reasonable policies, procedures, and rules in order to provide an orderly and efficient administration of Scentsy's Plan;

j.  To the extent that it was allowed under Plan documents to implement its own policies, procedures, and rules, by instituting unreasonable policies, procedures, and rules which led to a disorderly and inefficient administration of Scentsy's Plan;

k.  To the extent it delegated its responsibilities to a third party or affiliate, by failing to take any action to alert that third party or affiliate of any relevant deadlines;

l.  To the extent it delegated its responsibilities to a third party or affiliate, by failing to take any action to expedite that party's review;

m.  By mishandling essential Plan functions expressly delegated to it;

n.  By failing to exercise appropriate authority or control over Plan assets;

o.  By mismanaging and/or maladministering Plan assets; and

p.  By causing the depletion, impairment, and/or disposal of Plan assets.

72.  As a proximate result of these breaches, among others, Scentsy and/or the Plan have suffered harm and damages listed above, currently believed to be in excess of $1.6MM. Blue Cross should be compelled to either pay damages or hold the funds it took in violation of its fiduciary duty in constructive trust for Scentsy and/or the Plan.

COMPLAINT - 20

73.     Pursuant to 29 U.S.C. § 1109, ERISA 409, Blue Cross is personally liable to make good to Scentsy and/or the Plan any losses resulting from its breach of fiduciary duty.  It is also subject to such other equitable or remedial relief as is appropriate.

74.     Pursuant to 29 U.S.C. § 1132(a)(3), ERISA 502(a)(3), this Court should award appropriate equitable relief to redress Blue Cross's violations of ERISA and the Plan and to enforce the provisions of ERISA and the Plan.

75.     As a fiduciary, Blue Cross is also subject to such other equitable or remedial relief as this Court may deem appropriate.

### *Third Cause of Action:  Breach of Contract*

76.     The preceding paragraphs are incorporated herein as if fully set forth.

77.     Alternatively, Blue Cross is liable to Scentsy under a cause of action for breach of contract.

78.     As described more fully above, Scentsy and Blue Cross entered into at least two valid and enforceable contracts relevant here: the 2020-2021 ASA and the 2021-2022 Excess Loss Contract.

79.     As described more fully above, Blue Cross materially breached those contracts by, among other things:

     a.  Not paying claims in accordance with the Excess Loss Contract;

     b.  Failing to adequately or timely process and pay benefit claims under the ASA;

     c.  By implementing policies, procedures, and rules not found in Plan documents;

     d.  To the extent that it was allowed under Plan documents to implement its own policies, procedures, and rules, by failing to institute reasonable policies, procedures, and rules in order to provide an orderly and efficient administration of Scentsy's Plan;

COMPLAINT - 21

e.  To the extent that it was allowed under Plan documents to implement its own policies, procedures, and rules, by instituting unreasonable policies, procedures, and rules which led to a disorderly and inefficient administration of Scentsy's Plan;

f.  Instituting unreasonable policies, procedures, and rules which led to a disorderly and inefficient administration of Scentsy's Plan;

g.  Needlessly delaying payment of claims.

80.  On information and belief, other breaches may also exist.

81.  Blue Cross's breaches were not mistakes of judgment, but instead a result of either gross negligence or a lack of good faith.  Blue Cross needlessly withheld payment on legitimate claims for months, either due to an egregious set of mistakes or due to its own conflict of interest.  When asked for an explanation, Blue Cross has changed its story several times, only to correct the record later with tacit admissions of unaccountable delays.  These are not the actions of either a good-faith actor or competent administrator.

82.  Scentsy complied with these contracts at all relevant times.

83.  As a foreseeable result of Blue Cross's breaches, Scentsy has incurred significant damages, as described above.

### *Fourth Cause of Action:  Breach of Covenant of Good Faith and Fair Dealing*

84.  The preceding paragraphs are incorporated herein as if fully set forth.

85.  Alternatively, Blue Cross is liable for damages for having breached the covenant of good faith and fair dealing.

86.  Blue Cross entered into at least two valid and enforceable contracts with Scentsy which are relevant here, as described above.

87.  By law, Blue Cross owed a duty of good faith and fair dealing to Scentsy in its performance of these contracts.

88.    Blue Cross's acts as described herein have violated, nullified, and/or significantly impaired the benefits of the contracts.  Blue Cross has not performed its contractual duties in good faith.

89.    Scentsy's justifiable expectations under the contracts have been denied.

90.    As a foreseeable result of Blue Cross's breaches, Scentsy has incurred significant damages, as described above.

### Fifth Cause of Action:  Breach of Fiduciary Duty (State or Common Law)

91.    The preceding paragraphs are incorporated herein as if fully set forth.

92.    Alternatively, Blue Cross is liable to Scentsy under a cause of action for breach of fiduciary duty (state or common law).

93.    Among other things, Blue Cross was at all times relevant to this action both Scentsy's insurer and its agent for processing Participant medical claims.  As explained above, Blue Cross knew that Scentsy was in a precarious position—as both Scentsy's processing agent and its insurer, Blue Cross was uniquely positioned to take advantage of Scentsy if it wanted. Scentsy reposed special trust and confidence in Blue Cross as it related to the processing, payment, and reimbursement of claims, and Blue Cross knew as much.  Scentsy placed both money and authority in Blue Cross's hands and then authorized Blue Cross to act on its behalf. The law accordingly imposed a fiduciary duty upon Blue Cross.

94.    Among other things, and as explained more fully above, Blue Cross breached its fiduciary duty by:

    a.  Either purposefully or unnecessarily delaying its administration and payment on certain claims;

    b.  By failing to act with the care, skill, prudence, and diligence under the circumstances;

c.  By failing to process the claims consistent with the deadlines set forth in the deadlines found in ERISA's regulations, as described above;

d.  By not paying claims in accordance with the agreements between the parties;

e.  By failing to comply with the agreements between the parties even after being alerted to Blue Cross's obviously erroneous interpretation of same;

f.  By implementing policies, procedures, and rules not found in Plan documents;

g.  To the extent that it was allowed under Plan documents to implement its own policies, procedures, and rules, by failing to institute reasonable policies, procedures, and rules in order to provide an orderly and efficient administration of Scentsy's Plan;

h.  To the extent that it was allowed under Plan documents to implement its own policies, procedures, and rules, by instituting unreasonable policies, procedures, and rules which led to a disorderly and inefficient administration of Scentsy's Plan;

i.  To the extent it delegated its responsibilities to a third party or affiliate, by failing to take any action to alert that third party or affiliate of any putative deadlines;

j.  To the extent it delegated its responsibilities to a third party or affiliate, by failing to take any action to expedite that party's review; and

k.  By mishandling essential functions expressly delegated to it.

95.    Blue Cross did not keep Scentsy's best interests in mind.  It acted in its own self-interest to Scentsy's detriment.

96.    Upon information and belief, Blue Cross has taken other actions which have breached its fiduciary duty.

97.    As a foreseeable result of Blue Cross's breaches, Scentsy has incurred significant damages, as described above.

COMPLAINT - 24

### *Sixth Cause of Action: Unjust Enrichment*

98.    The preceding paragraphs are incorporated herein as if fully set forth.

99.    Alternatively, Blue Cross is liable to Scentsy under an unjust enrichment cause of action.

100.    Blue Cross has received a benefit from Scentsy which would be inequitable to retain.  Specifically, Blue Cross is in possession of money which rightly belongs to Scentsy.

101.    Blue Cross took money from Scentsy which did not belong to it.  Blue Cross had the ability to directly debit money from Scentsy for legitimate medical claims under a certain threshold, but only if based on certain conditions.  Those conditions were not met here, a fact which Blue Cross knew, but disregarded.

102.    Blue Cross's continued retention of that money would be inequitable.  Blue Cross should be required to return it as the retention of the money works a harm to Scentsy.

### *Seventh Cause of Action: Bad Faith (Insurance)*

103.    The preceding paragraphs are incorporated herein as if fully set forth.

104.    Alternatively, Blue Cross is liable to Scentsy under a cause of action for bad faith as an insurer.

105.    Scentsy is a first-party insured under the Excess Loss Contract.  Blue Cross agreed to provide coverage to either pay or reimburse Scentsy once a Participant's medical bills hit a certain threshold.

106.    As described above, Blue Cross unreasonably and intentionally denied and withheld payment on certain of the Patient's claims for months.  Blue Cross then refused to pay on the Excess Loss Contract because it erroneously represented that the Excess Loss Contract had terms which do not exist.

107.    The delay on the payment of the claims was not fairly debatable.  First, Blue Cross's failure to pay ultimately lies in an obvious misreading of its own Excess Loss Contract, as described above.  Even when alerted to its error, Blue Cross refused to pay.

108.    Second, even if the contract read as Blue Cross believed, Blue Cross eventually approved the Patient claims at issue, meaning they were legitimate and payable from the beginning.  And to date Blue Cross has never proffered any excuse which would explain the extraordinary delays in getting to its eventual decision to approve.  Again, Blue Cross had previously approved a nearly identical set of claims for the same Patient in a small fraction of the time and even according to its own records, it did nothing for months while those claims at issue were pending.  In other words, whatever the reason for the delay, it cannot have anything to do with debatability.

109.    There is no possibility of a good-faith mistake under these facts.

110.    Scentsy has been seriously harmed by Blue Cross's bad faith, and the resulting harm is not fully compensable by contract damages.

## VI.  PUNITIVE DAMAGES

111.    The preceding paragraphs are incorporated herein as if fully set forth.

112.    Blue Cross's acts as described above were oppressive, fraudulent, malicious, and/or outrageous.  Punitive damages are permitted under Scentsy's claims for bad faith, breach of good faith and fair dealing, and breach of fiduciary duty, among others.  As such, Scentsy will move at an appropriate juncture for leave to amend to add a claim for punitive damages.

## VII.  PRAYER

**WHEREFORE**, Scentsy prays that the Court (pled in the alternative where the law allows):

1.    Declare that Blue Cross has violated the duties, responsibilities, and obligations imposed upon it as a fiduciary under ERISA;

2.    Compel Blue Cross to make good all losses to the Plan and/or Scentsy resulting from Defendant's breaches, described above;

COMPLAINT - 26

3.      Compel Blue Cross to hold the funds it took in violation of its duties in constructive trust for Scentsy and/or the Plan;

4.      Award declaratory and injunctive relief, finding that Scentsy and/or the Plan are entitled to recover from Blue Cross the actual damages and all other losses incurred as a result of its duties;

5.      Find that Blue Cross has breached its contractual, state, and/or common law duties and obligations;

6.      Award monetary damages in an amount to be proven at trial;

7.      Grant Scentsy appropriate equitable relief against Blue Cross, as permitted by law, equity, and the federal statutory provisions set forth herein, including but not limited to restitution, surcharge, equitable estoppel, and/or other appropriate remedial relief;

8.      If allowable by law, award Scentsy prejudgment interest on all or part of the damages sought;

9.      In the unlikely event that the law displaces the contractual disallowance of fee and cost switching, award Scentsy and/or the Plan all reasonable attorneys' fees and costs incurred as a result of Blue Cross's actions alleged herein; and

10.     Such other and further relief as this Court may deem just and proper.

DATED THIS 6th day of December, 2023.

SCENTSY, INC.

By: /s/ *Brent Bastian*
Brent Bastian, ISB 8017
 Attorney for Plaintiffs

COMPLAINT - 27