UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

SCENTSY, INC.,

Plaintiff,

v.

BLUE CROSS OF IDAHO HEALTH SERVICE, INC.,

Defendant.

Case No. 1:23-cv-00552-AKB

**MEMORANDUM DECISION AND ORDER**

Pending before the Court is Plaintiff Scentsy, Inc.'s Motion for Summary Judgment (Dkt 49); Plaintiff's Motion to Seal (Dkt. 51); Defendant Blue Cross of Idaho Health Service, Inc.'s (BCI) Motion for Summary Judgment (Dkt. 52); and Defendant's Motion to Seal (Dkt. 53). Having reviewed the record and the parties' submissions, the Court finds that the facts and legal argument are adequately presented and that oral argument would not significantly aid its decision-making process, and it decides the motion on the parties' briefing. Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B); *see also* Fed. R. Civ. P. 78(b) ("By rule or order, the court may provide for submitting and determining motions on briefs, without oral hearings."). The Court grants Scentsy summary judgment on Counts One and Two under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(a)(3). Further, the Court grants BCI summary judgment on the remaining Counts Three through Seven. Finally, the Court grants the motions to seal.

## BACKGROUND

Based on the record, the Court finds the following undisputed facts:[1] Scentsy is an Idaho employer which sponsors a self-funded health benefit plan called the Scentsy, Inc., Group Health Plan (the Plan) (Dkt. 49-5; Dkt. 52-1 at 3). The Plan covers Scentsy's eligible employees, their spouses, and their dependents (Participants) (Dkt. 49-6 at 4). BCI sells health insurance and provides claim administration services to self-funded employee health benefit plans like the Plan (Dkt. 52-1 at ¶ 2). The parties entered into an Administrative Services Agreement (ASA) related to the Plan (Dkt. 49-6).

The ASA refers to Scentsy as the "Plan Sponsor" and states that BCI agrees to provide general administrative services and benefit payment services to the Plan from May 1, 2020, through April 30, 2022[2] (Dkt. 52-1 at ¶ 4; Dkt. 49-6 at 4, Recitals). The ASA provides that BCI shall process and pay claims "in accordance with the Plan[]or as otherwise directed in writing by the Plan Sponsor[] and conduct any necessary investigation and make the initial determination of the validity of each request for benefits" (Dkt. 49-6 at 6, Art. II. B. 1.). By providing these services, BCI was the Plan's "claim administrator" (Dkt. 52-2 at 10 (referring to BCI's status as "claims

---

[1] BCI disputes much of Scentsy's characterization of the facts in Scentsy's Statement of Undisputed Facts (Dkts. 49-10, 57-3). Scentsy, however, does not dispute BCI's Statement of Undisputed Facts (Dkt. 52-1). The Court draws the undisputed facts from Scentsy's Statement to the extent BCI does not dispute that Statement (*compare* Dkt. 49-10 *with* Dkt. 57-3), from BCI's undisputed Statement (Dkt. 52-1), and from undisputed documents in the record.

[2] The parties' original ASA was effective from May 2020 through April 2021, and it automatically renewed for a successive twelve months from May 2021 through April 2022 (Dkt. 49-6 at 10, Art. IV. A.). The ASA was amended effective May 1, 2021 (Dkt. 50), but those amendments are not pertinent to the parties' dispute.

administrator"); Dkt. 57 at 2 n.1 (same)). Further, the ASA provides that BCI shall act as an "ERISA Claim Fiduciary" (Dkt. 49-6 at 6, Art. II. B. 4.).

The ASA contemplates Participants may receive medical services "outside the geographic area BCI services" and includes a provision entitled "Out-of-Area Services" (*id.* at 14, Art. VII. E.). The "Overview" section of this provision is described as a "disclosure" and explains that BCI has relationships with other Blue Cross or Blue Shield "licensees," which are also referred to as "Host Blue" (*id.*). These relationships are governed by "Inter-Plan Arrangements," which "operate under rules and procedures issued by the Blue Cross Blue Shield Association [Association]" (*id.*).

The ASA provides that "whenever Participants access healthcare services outside the geographic area BCI serves, the claim for those services may be processed through [an] Inter-Plan Arrangement[]" (*id.*). The ASA then describes generally "how claims are administered for Inter-Plan Arrangements and the fees that are charged in connection with Inter-Plan Arrangements" (*id.*). According to the ASA, "the Host Blue will be responsible for contracting and handling all interactions with its participating health care Providers" under the Inter-Plan Arrangements (*id.* at Art. VII. E. A.). The ASA expressly states, however, that "BCI remains responsible for fulfilling its contractual obligations to [Scentsy]" (*id.*).

While BCI was contractually obligated to process and pay claims under the ASA, BCI and Scentsy were also parties to an Excess Loss Contract (ELC) (Dkt. 50-1). The ELC states BCI agrees "to provide excess loss coverage" (also referred to as "stop loss coverage") for benefits paid under the Plan (*id.* at 2). The provision at issue is entitled "12/15 Month Specific Excess Loss Coverage" (*id.* at 3). It provides that Scentsy "shall have sole financial responsibility to pay Benefit Claims [under the Plan] until the total amount of such payments reaches the Specific Excess Loss Amount" (*id.*). The loss amount triggering the coverage under the ELC is $200,000 (*id.* at 10). The

ELC limits this coverage, however, to claims "incurred during the then current Contract Period [which] are paid either during the then Current Contract Period or during the months immediately following that Contract Period"[3] (*id.*). The contractual period at issue is May 1, 2021, through April 30, 2022.

The crux of the parties' dispute is whether BCI is obligated to pay an excess claim for a Plan Participant, Baby H., for medical services she received during the ELC's contractual period but which BCI paid more than three months after the ELC's coverage period arguably terminated. Baby H. was born in Idaho in February 2022, and she has a "complex diagnosis" of serious birth defects, including VACTERL association, bilateral multicystic-dysplastic kidneys resulting in renal failure and requiring aquapheresis, an imperforate anus, and a duodenal atresia (Dkt. 54-3 at 6). After Baby H. was born, she was transferred to the newborn intensive care unit at Lucile Salter Packard Children's Hospital (LSPCH) in California (Dkt. 21 at 11; Dkt. 52-1 at ¶ 33).

At that time, LSPCH had a contract with Blue Shield of California (BSC), one of the licensees referred to as a Host Blue under the ASA (Dkt. 52-1 at ¶ 37). BSC was the Host Blue which was responsible for contracting with and handling all interactions with LSPCH (*see id.* at 2, ¶ 8; *id.* at 7, ¶ 43). Between February and March 2022, Baby H. incurred $987,353 in medical bills at LSPCH (first excess claim) (Dkt. 49-1 at 6, ¶ 14). Then, between March and April 22, 2022, Baby H. incurred approximately $1,412,488 in medical bills at LSPCH (second excess claim) (*id.* at 6, ¶ 14, n.4; Dkt. 50-3 at 2). On April 21, 2022, BCI's account leader, Brie Barker,

---

[3] Despite that the provision's title is "12/15 Month Specific Excess Loss Coverage," the provision's actual text does not limit coverage to the three months following the contractual period (Dkt. 50-1 at 3, Art. II. A.). The Court's ruling does not require it to resolve this inconsistency.

notified Scentsy about Baby H.'s serious, complex diagnosis and that she was a "high cost claimant" (Dkt. 52-1 at ¶ 39; Dkt. 54-3 at 6). After April 22, Baby H. was transferred to Seattle Children's Hospital (Dkt. 52-1 at ¶¶ 34-36).

On May 30, 2022, BCI paid the first excess claim for medical services that LSPCH provided to Baby H. in February and March 2022, and it covered that claim under the ELC. (Dkt. 49-10 at 6, ¶ 13; Dkt. 50-3 at 3). BCI, however, refused coverage under the ELC for Baby H.'s second excess claim for LSPCH's services in March and April 2022. BCI explains that it received this second excess claim from BSC on September 19, 2022; the claim was "outside' the ELC's coverage period which BCI asserts was July 30, 2022—three months after the ELC's contractual period expired; and BCI timely paid the claim on October 10, 2022 (Dkt. 52-1 at ¶¶ 43-45, 49). Because BCI refused excess coverage, Scentsy ultimately paid the entire second excess claim (Dkt. 49-10 at 6, ¶ 14 and n.4; *see also* Dkt. 57-3 at 4-5 ("Response to Stmt 14")).

After BCI refused coverage for the second excess claim, Scentsy filed this action. It brings the suit on behalf of itself and the Plan (Dkt. 1 at ¶ 2). It alleges seven claims for relief against BCI, including claims for breach of fiduciary duty under ERISA, 29 U.S.C. § 1132(a)(2) and (a)(3) (Dkt. 1 at ¶¶ 41-75 (Counts One and Two)); breach of contract (*id.* at ¶¶ 76-83 (Count Three)); breach of the covenant of good faith and fair dealing (*id.* at ¶¶ 84-90 (Count Four)); breach of fiduciary duty under state common law (*id.* at ¶¶ 91-97 (Count Five)); unjust enrichment (*id.* at ¶¶ 98-102 (Count Six)); and bad faith insurance (*id.* at ¶¶ 103-110 (Count Seven)). Scentsy alleges its state law claims, Counts Three through Seven, in the alternative to its ERISA claims, Counts One and Two (*see, e.g.*, Dkt. 1 at ¶¶ 40, 77, 85, 92, 99, 104 (alleging claims in alternative to ERISA claims)). The parties both move for summary judgment on all Counts. As discussed below, the Court's ruling on Counts One and Two resolves their dispute.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The trial court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). In considering a motion for summary judgment, the court must "view[ ] the facts in the non-moving party's favor." *Id.* To defeat a motion for summary judgment, the nonmoving party must present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in the respondent's favor." *Id.* (citation omitted).

The trial court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The nonmoving party cannot simply rely on unsworn assertions or the pleadings to defeat a motion for summary judgment; rather, the nonmoving party must set forth the "specific facts," supported by evidence, with "reasonable particularity" that preclude summary judgment. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

Where parties file cross-motions for summary judgment on the same issue, the Court considers each motion on its own merits and reviews all evidence submitted by both parties. *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). Cross-motions do not by themselves establish that no genuine dispute of material fact exists. *Id.*

## ANALYSIS

### A. BCI is an ERISA Fiduciary Under the ASA

Scentsy's ERISA claims allege that BCI breached its fiduciary duties under both the ASA and the ELC (Dkt. 1 at ¶¶ 62-75). As an initial matter, the Court addresses whether BCI is an ERISA fiduciary. BCI disputes that it is an ERISA fiduciary under the ELC (Dkt. 52-2 at 10-11; Dkt. 57 at 10), and Scentsy now concedes BCI is not an ERISA fiduciary under that agreement (Dkt. 58 at 12 ("Scentsy is not arguing that BCI is an ERISA fiduciary under the [ELC].")).

Scentsy, however, argues at length that BCI is an ERISA fiduciary under the ASA, including both a named and functional fiduciary (Dkt. 49-1 at 3-10). Indeed, the ASA specifically refers to BCI as a fiduciary. For example, it states that "BCI shall . . . [a]ct as an ERISA Claim Fiduciary (within the meaning set forth in ERISA and applicable Department of Labor Regulations) in adjudicating initial claims and reviewing denied claims . . ." and that Scentsy will pay BCI a "Claim Fiduciary Service Fee" for its services (Dkt. 49-6 at 6, Art. II. B. 4.).

BCI does not respond to Scentsy's arguments that it is an ERISA fiduciary under the ASA (*see generally* Dkt. 57). As a result, Scentsy argues BCI "admits it owes ERISA-imposed fiduciary duties to Scentsy" (Dkt. 58). The Court agrees with Scentsy that BCI concedes it is an ERISA fiduciary under the ASA by not responding to Scentsy's arguments. *See S. Nev. Shell Dealers Ass'n v. Shell Oil Co.*, 725 F. Supp. 1104, 1109 (D. Nev. 1989) (noting failure to oppose movant's argument implicitly concedes argument). Accordingly, the Court finds that it is undisputed that BCI is an ERISA fiduciary under the ASA, and it analyzes whether BCI breached its fiduciary duties under that agreement.

**B. BCI Breached Its Fiduciary Duty to Avoid an Actual Conflict of Interest**

An ERISA fiduciary owes duties of prudence and loyalty. The duty of prudence requires that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and with the care, skill, prudence, and diligence of a prudent man. 29 U.S.C. § 1104(a)(1)(B). The duty of loyalty requires that a fiduciary must act for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan. 29 U.S.C. § 1104(a)(1)(A). The duty of loyalty includes avoiding conflicts of interest. *See, e.g.*, *Mertens v. Hewitt Assocs*, 508 U.S. 248, 252 (1993) (noting "avoidance of conflicts of interest" is fiduciary duty).

When the same entity both funds an ERISA benefit and evaluates claims, it faces a conflict of interest. *Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 900 (9th Cir. 2016) ("MetLife has a structural conflict of interest because MetLife both evaluates claims made against the Plan and funds claims."). "A fiduciary with a conflict of interest must act as if he is 'free' of such a conflict. There is no balancing of interests; ERISA commands undivided loyalty to the plan participants." *Bedrick By & Through Humrickhouse v. Travelers Ins. Co.*, 93 F.3d 149, 154 (4th Cir. 1996); *see also Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016) (noting ERISA fiduciary duties are the "highest known to the law").

Here, BCI was undisputedly operating under a conflict of interest while serving as an ERISA fiduciary. Under the ASA, BCI agreed to process claims by "conduct[ing] any necessary investigation and mak[ing] the initial determination of the validity of each request for benefits" (Dkt. 49-6 at 6, Art. II. B. 1.). The ASA does not limit these services to claims based on any monetary amount; in other words, the ASA does not provide that BCI will not investigate and determine the validity of a claim that may qualify as an excess loss claim under the ELC. Because

BCI is both the claims administrator for excess loss claims under the ASA and it covers those claims under the ELC, it faces a conflict of interest anytime there is an excess loss claim. BCI had an actual conflict of interest because it owed fiduciary duties to administer the second excess claim and a contractual obligation to cover that claim.

**1. BCI's relationship with BSC did not absolve BCI of its fiduciary duties**

The Court is not persuaded by BCI's arguments that it did not owe any fiduciary duties under the facts of this case. BCI argues that "it had no discretionary authority or control over [BSC's] handling" of the second excess claim (Dkt. 52-2 at 8). In support, BCI relies on the ASA's "Out-of-Area Services" provision (Dkt. 49-6 at 14, Art. VII. E.). BCI explains that this provision absolves it of its fiduciary duties because: (1) under an Inter-Plan Arrangement it had a relationship with BSC, which in turn had a contract with LSPCH; (2) the Association's Inter-Plan Programs Policies and Provisions (IPP Manual) governed BCI and BSC's relationship; (3) per the IPP Manual, BSC was "required to conduct reviews of high-dollar claims," i.e., claims exceeding $100,000; (4) BCI was required to "accept the outcome" of BSC's "payment integrity activities"; and (5) "the IPP Manual does not provide any mechanism by which [BCI] may dictate or control how a Host Blue conducts payment integrity activities with its participating providers" (Dkt. 52-1 at ¶¶ 13-21, 37-38). BCI additionally refers to the Association's "Payment Integrity Manual," as establishing the "requirements for a Host Blue's high-dollar claims reviews" with which BCI contends it could not interfere (*id.* at ¶¶ 22-23).

Based on this explanation, BCI argues that Scentsy agreed in the ASA "that claims out of BCI's service area would be subject to Inter-Plan Arrangements, which in turn operate according to the Association's rules and procedures"; under this arrangement, BCI "lacked authority or control over [BSC] to ensure it transmitted the second excess claim more quickly"; and absent

"such authority or control, BCI did not owe fiduciary obligations" (Dkt. 52-2 at 8) (quotations omitted). BCI, however, cites no authority that it can contract away its ERISA fiduciary duties by having a third party, like BSC, process claims made under the Plan. Indeed, ERISA prohibits such agreements. Section 1110(a) provides that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy." 29 U.S.C. § 1110(a). Construing this provision, the Ninth Circuit has ruled that "if an ERISA fiduciary writes words in an instrument exonerating itself of fiduciary responsibility, the words, even if agreed upon, are generally without effect." *Johnson v. Couturier*, 572 F.3d 1067, 1080 (9th Cir. 2009) (citation omitted). Because BCI cannot contract away its fiduciary duties, its argument that Scentsy agreed to allow it to avoid these duties fails.

Even assuming ERISA did not prohibit BCI from contracting away its fiduciary duties, BCI's argument still fails. It argues that Scentsy agreed in the ASA that BCI could give up its control and authority to process the Plan's out-of-area claims to a third party. The ASA, however, cannot be read so broadly. Nothing in the ASA states Scentsy agrees that BCI is not responsible for processing claims under the Plan outside its area of service. Rather, the ASA characterizes the "Out-of-Services" provision as a "disclosure" and states that a claim for out-of-area services "*may* be processed"—not *will* be processed—through an Inter-Plan Arrangement. More importantly, the provision expressly states that "BCI remains responsible for fulfilling its contractual obligations to you" (Dkt. 49-6 at 14, Art. VII, E.).

BCI's argument fails for another reason—nothing in the record indicates that BCI provided Scentsy with the documents upon which it relies to explain its purported lack of fiduciary duties. Specifically, BCI relies on the Association's IPP Manual and its Payment Integrity Manual. The

ASA, however, does not identify these documents; the record does not indicate BCI ever disclosed them to Scentsy; and BCI provides no authority for its assertion that Scentsy is bound by these documents even though BCI did not disclose them to Scentsy in the ASA or otherwise. The law generally provides the contrary: an agreement should "clearly and unequivocally incorporate by reference" any additional documents governing the parties' agreement. *K.G. v. Univ. of San Francisco Welfare Benefit Plan*, No. 23-CV-00299-JSC, 2024 WL 1589980, at *6 (N.D. Cal. Apr. 11, 2024).

Here, however, the ASA does not identify or reference the IPP Manual and the Payment Integrity Manual by name. Further, nothing in the ASA would have guided Scentsy to these documents as part of the parties' agreement under the ASA. Importantly, nothing in the ASA would have indicated to Scentsy that excess loss claims would necessarily be subjected to a third party's heightened review which might delay the claim's processing without regard to BCI's fiduciary duties. Because BCI cites no authority that its relationship with BSC absolved BCI of its fiduciary duties and because the ASA cannot fairly be read to stand for this proposition, the Court rejects BCI's assertion that it owed no fiduciary duties to Scentsy because it lacked control and authority over BSC.

**2. BCI undisputedly knew the second excess claim was being processed**

The Court, likewise, rejects BCI's assertion that it did not owe fiduciary duties because "it is undisputed that BCI did not even know there was a Claim until after [ELC's] termination" (Dkt. 52-1 at 7, ¶ 44; Dkt. 57 at 1). According to BCI, it could not have breached its fiduciary duties "by failing to *pay* a Claim that it had not even received" until September 2022, which was after the ECL's coverage expired (Dkt. 57 at 2) (emphasis added). This argument narrowly misconstrues BCI's obligations under the ASA to both process and pay claims. While BCI may

not have technically known the *payable* amount of the second excess claim until after the ELC expired, it undisputedly knew an excess claim was being *processed* for Baby H. *before* the ELC expired.

Most notably, Brie Barker, BCI's "strategic account director," emailed Scentsy about Baby H. on April 21, 2022—more than three months *before* the earliest arguable expiration of the ELC's coverage period on July 30, 2022 (Dkt. 54-3 at 6). In her email, Barker notified Scentsy that Baby H. was a "high cost claimant"; described in detail her serious, complex diagnosis; reported about a "care conference" among her providers and the need to transfer her because of an impending nurses' strike; and indicated BCI was communicating with Baby H.'s parents about her medical care.

BCI relies on Barker's April 2022 email to argue that Scentsy knew about the potential excess claim but "did not ask BCI to pay the Claim prior to the end of [the ELC's] coverage period" (Dkt. 52-2 at 10; *see also* Dkt. 57 at 8). Meanwhile, BCI denies it knew about the claim until September 2022. BCI, however, cannot credibly argue both that Scentsy knew about the claim based on information that BCI provided to Scentsy in April 2022 and that BCI did not know about the claim despite possessing that same information. Moreover, no evidence indicates that BCI ever told Scentsy that it was not processing the second excess claim. Regardless, BCI fails to cite any authority that it may avoid its fiduciary duties unless Scentsy instructs it to comply with those duties.

Based on the record, it is undisputed that months *before* the ELC expired, BCI knew that Baby H. was a Participant who had been born with serious birth defects; it knew she had incurred an excess loss claim at LSPCH from February 20 to March 21; it knew she remained hospitalized at LSPCH in April 2022; and it knew her medical care was ongoing. These facts were sufficient

to put BCI on notice that the second excess claim was being processed at least three months before the ELC's coverage expired.

Because of BCI's conflict of interest, it had a fiduciary duty of loyalty to ensure timely processing of that claim to avoid a lapse in excess coverage. *See Technibilt Group Ins. Plan v. Blue Cross and Blue Shield of N.C.*, No. 5:19-CV-00079-KDB-DCK, 2021 WL 1147168, at *2 (W.D.N.C. Mar. 25, 2021) (finding Blue Cross's fiduciary duties extended to decisions whether to pursue expedited claims handling to timely pay very large claim under excess loss coverage). BCI, however, offers no evidence that it took any steps to address its conflict of interest. Instead, BCI ignored its fiduciary duties. For example, it made no effort to expedite the claim or to pay it retroactively. As BCI's director of underwriting noted, "BCI has in the past been willing to retroactively modify Specific Stoploss Contracts to cover claims such as this one" (Dkt. 50-5 at 3). Accordingly, the Court concludes BCI breached its fiduciary duty of loyalty in violation of § 1132(a)(2) and (a)(3), and it grants Scentsy summary judgment on Counts One and Two.

**3. Scentsy is entitled to surcharge under § 1132(a)(3)**

BCI argues that Scentsy cannot recover money damages under § 1132(a)(3) and that it is not entitled to a constructive trust under § 1132(a)(2) or (a)(3) (Dkt. 52-2 at 11-12; Dkt. 57 at 11-12). Scentsy does not dispute either that it cannot recover under the theory of constructive trust or receive money damages under § 1132(a)(3). *See S. Nev. Shell Dealers Ass'n*, 725 F. Supp. at 1109 (noting failure to oppose movant's argument implicitly concedes argument). Instead, it argues that it is entitled to equitable relief in the form of a surcharge under § 1132(a)(3) (Dkt. 58 at 14).

In support, Scentsy relies on *CIGNA Corp. v. Amara*, 563 U.S. 421 (2011). In that case, the Supreme Court identified three traditional equitable remedies available under § 1132(a)(3) against a defendant who is a plan fiduciary, including reformation, estoppel, and "surcharge."

*CIGNA*, 563 U.S. at 439-43. The Court explained that ERISA treats a plan fiduciary as a "trustee" and that "equity courts possessed the power to provide relief in the form of monetary 'compensation' for a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment." *Id.* at 439, 441. It described this equitable monetary remedy as a "surcharge." *Id.* at 442. The Court distinguished *Mertens*, 508 U.S. 248, in which it held ERISA does not authorize suits for money damages against nonfiduciaries under § 1132(a)(3), on the grounds that the defendant in *CIGNA* was a fiduciary. It ruled that "the fact that the defendant in this case, unlike the defendant in *Mertens,* is analogous to a trustee makes a critical difference." *CIGNA*, 563 U.S. at 442.

BCI does not dispute that surcharge is an available remedy under § 1132(a)(3) (Dkt. 60 at 4). *See S. Nev. Shell Dealers Ass'n*, 725 F. Supp. at 1109 (noting failure to oppose movant's argument implicitly concedes argument). To the extent BCI suggests that Scentsy has not requested surcharge as a remedy, the Court disagrees. Both Count Two and Scentsy's prayer for relief request "appropriate equitable relief," and the prayer expressly identifies surcharge as such relief (Dkt. 1 at ¶¶ 73-75, prayer ¶ 7). Because BCI breached its fiduciary duty by failing to address its conflict of interest, Scentsy is entitled to surcharge under Count Two to the extent that BCI was unjustly enriched, namely in the amount which Scentsy paid to cover Baby H.'s second excess claim.

Neither party addresses the Plan's right to recover money damages under § 1132(a)(2), as alleged in Count One (Dkt. 1 at 17, ¶ 60). Section 1132(a)(2) provides that a plan's fiduciary can sue "for appropriate relief under [§] 1109." 29 U.S.C. § 1132(a)(2). Section 1109, in turn, states that a person who violates ERISA fiduciary duties is "personally liable to make good to such plan any losses to the plan" from the breach and "to restore the plan any profits" resulting from the

breach. *Id.* at 1109(a). "The Supreme Court has held that recovery for a violation of [§ 1109] for breach of fiduciary duty inures to the benefit of the plan as a whole." *Paulsen v. CNF Inc.*, 559 F.3d 1061, 1073 (9th Cir. 2009) (citing *Mass. Mut. Life. Ins. Co. v. Russell*, 473 U.S. 134, 140-42 (1985).

Here, Scentsy asserts Count One under § 1132(a)(2) on the Plan's behalf (Dkt. 1 at 17, ¶ 6). Scentsy's Statement of Undisputed Facts, however, represents that Scentsy, not the Plan, paid the second excess claim (Dkt. 49-10 at 6, ¶ 14). Scentsy, however, cannot recover monetary damages on its own behalf under § 1132(a)(2). But it can recover monetary damages on the Plan's behalf—to the extent that the Plan suffered the loss.

**C. State Law Claims – Counts Three Through Seven**

BCI argues that ERISA preempts Scentsy's state law claims (Dkt. 52-2 at 13). Scentsy, however, pleaded these claims in the alternative to its ERISA claims (*see, e.g.*, Dkt. 1 at ¶¶ 40, 77, 85, 92, 99, 104 (alleging claims in alternative to ERISA claims); Dkt. 49 at 2; Dkt. 49-1 (making alternative summary judgment arguments); Dkt. 59 (same)). Because the Court concludes Scentsy is entitled to summary judgment on its ERISA claims, the Court does not address Scentsy's alternative state law claims and grants BCI summary judgment on those claims, Counts Three through Seven.

**ORDER**

**IT IS HEREBY ORDERED:**

1. The Court **GRANTS** Plaintiff Scentsy, Inc.'s Motion for Summary Judgment (Dkt. 49) on Counts One and Two;

2. The Court **GRANTS** Defendant Blue Cross of Idaho Health Service, Inc.'s Motion for Summary Judgment (Dkt. 52) on Counts Three, Four, Five, Six, and Seven.

3. The Court **GRANTS** Plaintiff Scentsy, Inc.'s Motion to Seal (Dkt. 51).

4. The Court **GRANTS** Defendant Blue Cross of Idaho Health Service, Inc.'s Motion to Seal (Dkt. 53).

**DATED:** September 03, 2026

Amanda K. Brailsford
U.S. District Court Judge